Javier L. Merino #078112014
**THE DANN LAW FIRM, PC**
1520 U.S. Highway 130, Suite 101
North Brunswick, NJ 08902
Telephone: (216) 373-0539
Facsimile: (216) 373-0536
notices@dannlaw.com
*Counsel for Plaintiff Estate of Patricia Blumenstock*

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
TRENTON DIVISION**

| | |
|---|---|
| **ESTATE OF PATRICIA BLUMENSTOCK**, <br><br> Plaintiff, <br><br> v. <br><br> **LOANCARE, LLC; TIAA BANK; FEDERAL NATIONAL MORTGAGE ASSOCIATION,** <br><br> Defendants. | Case No. <br><br> Judge <br><br> **COMPLAINT FOR DAMAGES** <br><br> **JURY DEMAND ENDORSED HEREON** |

Plaintiff, Estate of Patricia Blumenstock ("Patricia"), by and through her court-appointed administrator, Sheila Blumenstock ("Sheila"[1]), through counsel, for her Complaint against Defendants LoanCare, LLC, TIAA Bank, and Federal National Mortgage Association, states:

**PARTIES, JURISDICTION, AND VENUE**

1.     In 2016, Patricia passed away. Her sister, Sheila, was appointed administrator of Patricia's estate.

---

[1] Patricia Blumenstock and Sheila Blumenstock are denoted by their first names as they share the same last name.

2.      Patricia is a natural person who formerly resided in 367 Cedar Avenue, Manasquan, NJ 08736 (the "Home"). Patricia formerly maintained the Home as her primary, principal residence, and maintained it until 2012, when Hurricane Sandy devastated the Home, and the Home became unlivable.

3.      Defendant LoanCare, LLC ("LoanCare") is a publicly traded company with its principal place of business located in Virginia Beach, Virginia.

4.      LoanCare is the servicer of a Note executed by Patricia (the "Note") and of a mortgage on the Home that allegedly secured the Note (the "Mortgage") (collectively, the "Loan"). A copy of the Loan is attached as **Exhibit 1**.

5.      LoanCare is doing business in the State of New Jersey as a business entity operating as a collection agency, and is a "debt collector" as the term is defined by 15 U.S.C. § 1692a(6) as it regularly engages, or attempts to engage, in the collection of "debts", and it regularly collects debts owed or due, or asserted to be owed or due, to another for which the primary purpose is for personal, family, or household use, including Sheila's Loan.

6.      LoanCare services the Loan on behalf of Defendant Federal National Mortgage Association ("FNMA"). FNMA is a government-sponsored entity under the conservatorship of the Federal Housing Finance Agency.

7.      LoanCare acquired servicing of the Loan from TIAA Bank on or around February 1, 2021. The Loan was in default when LoanCare acquired it.

8.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1692k(d), as this action arises under the Fair Debt Collection Practices Act, 15 U.S.C. § 1692, *et seq.* (FDCPA) and the Truth in Lending Act, 12 U.S.C. §§ 1601, *et seq.* ("TILA")

9.     This Court has supplemental jurisdiction to hear any and all state law claims that are plead herein or that may subsequently arise pursuant to 28 U.S.C. § 1367.

10.     Venue lies in this District pursuant to 28 U.S.C. § 1391(b), as a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District.

## TILA AND REGULATION Z

11.     TILA provides that a creditor or servicer of a home loan shall provide an accurate payoff balance within a reasonable period, but within seven (7) business days regardless of circumstances, upon receipt of a written request from a borrower for the same. 15 U.S.C. § 1639g.

12.     In January 2013, the Consumer Finance Protection Bureau ("CFPB") issued a number of final rules concerning mortgage markets in the United States, pursuant to the authority granted by the Dodd-Frank Wall Street Reform and Consumer Protection Act—Public Law No. 111-203, 124 Stat. 1376 (2010)—which amended TILA.

13.     The CFPB's TILA Mortgage Servicing Final Rules—known as "Regulation Z" and codified as 12 C.F.R. § 1026.1, *et seq.*—were issued on January 17, 2013, and became effective on January 10, 2014.

14.     Through Regulation Z, the CFPB has provided guidance for the interpretation of certain TILA provisions, including servicers' duties related to responding to requests for a payoff balance.

15.     Regarding payoff statements, Regulation Z provides that:

> In connection with a consumer credit transaction secured by a consumer's dwelling, a creditor, assignee or servicer, as applicable, must provide an accurate statement of the total outstanding balance that would be required to pay the consumer's obligation in full as of a specified date. The statement shall be sent within a reasonable time, but in no case more than seven business days, after receiving a written request from the consumer or any person acting on behalf of the consumer. When a creditor, assignee, or servicer, as applicable, is not able to provide the statement within seven

business days of such a request because a loan is in bankruptcy or foreclosure, because the loan is a reverse mortgage or shared appreciation mortgage, or because of natural disasters or other similar circumstances, the payoff statement must be provided within a reasonable time.

12 C.F.R. § 1026.36(c)(3).

## THE FDCPA

16.     Congress enacted the FDCPA to prohibit the "[u]se of abusive, deceptive, and unfair debt collection practices." 15 U.S.C. § 1692(a).

17.     Sheila asserts claims for relief against LoanCare for breaches of the specific rules under the FDCPA as set forth, *infra*.

18.     Sheila has a private right of action under the FDCPA pursuant to 15 U.S.C. § 1692k(a) for the claimed breaches and such action provides for remedies including actual damages, statutory damages, and attorneys' fees and costs.

## FACTUAL BACKGROUND

19.     On or about December 5, 2008, non-party Mortgage Source LLC, and Patricia entered into the Loan related to the Home.

20.     FNMA is the assignee of the Loan.

21.     In 2012, Hurricane Sandy devastated the Home, and Sheila and Patricia lost substantial possessions. The Home sustained 4-6 feet of water and mold, and the Home was unlivable from October 29, 2012 on, and was declared substantially damaged by the town of Manasquan.

22.     In 2013, Sheila and Patricia participated in a New Jersey State Grant program called RREM in an effort to repair their home, but they had the misfortune to be victimized by contractor fraud. They nonetheless tried to remain responsible to their obligations and continued to pay the Loan for a home they could not even live in.

4

23.     In 2014, like many Hurricane Sandy homeowners, Sheila and Patricia challenged the low amount offered by FEMA since the newly hired inspectors neglected to acknowledge and notate many aspects of the damage.

24.     In 2015, Patricia became ill and received the devastating diagnosis of Stage IV esophageal cancer. Sheila became Patricia's caregiver.

25.     In 2016, Patricia passed away. In 2017, Sheila went to the Office of the Surrogate and received Letters of Administration for Patricia's estate.

26.     Sheila retained a law firm to file a complaint against FEMA in an effort to increase the insurance payout. In 2018, an agreement was reached with FEMA. FEMA agreed to write a check in the amount of $166,682.91 made payable to both Sheila and to TIAA Bank. Sheila signed the check over to TIAA Bank. A copy of the check is attached as **Exhibit 2**.

27.     In 2018, after TIAA deposited the check, it paid $34,500.00 to Sheila's attorneys. TIAA has been in possession of the $132,182.01 balance from the check since 2018.

28.     On or around August 2019, the Home was demolished. After that, there was no lawn, just dirt. There were small patches of grass around the edges of the property, but Sheila's neighbor, Joseph Raslowsky, maintained and would cut the small patches of grass as needed. A copy of Raslowsky's Certification is attached as **Exhibit 3**.

29.     On September 23, 2016, non-party EverBank, TIAA's predecessor, filed a foreclosure complaint against Patricia and Sheila in the Superior Court of New Jersey, Chancery Division, Monmouth County, in the matter stylized *EverBank v. Patricia Blumenstock; et al.*, assigned docket number F-026109-16 (the "Foreclosure Action"). A copy of the docket sheet for the Foreclosure Action is attached as **Exhibit 4**.

30.     On or about June 4, 2018, EverBank merged with and became TIAA.

31.     On or about January 17, 2020, TIAA filed a Motion for Final Judgment in the Foreclosure Action ("Final Judgment Motion #1"), Through Final Judgment Motion #1, TIAA enclosed a proof of amount due, through which it claimed that Sheila owed $467,678.84 as of December 13, 2019. However, TIAA's Final Judgment Motion #1 failed to provide a credit for the $132,182.01 in insurance proceeds that it received from the Hurricane Sandy payout and which it continued to hold in an escrow suspense account. A copy of Final Judgment Motion #1 is attached as **Exhibit 5**.

32.     Final Judgment Motion #1 was uncontested, and on February 26, 2020, the court granted the motion and entered a final judgment against Sheila. A copy of the order is attached as **Exhibit 6**.

33.     Thereafter, Sheila retained counsel on behalf of Patricia's estate to contest the Foreclosure Action. On October 15, 2020, Sheila, through counsel, filed a motion to vacate the February 26, 2020 final judgment. Through Sheila's motion, she argued that the February 26, 2020 final judgment order should be vacated due to, amongst other arguments, TIAA's failure to account for the insurance proceeds in its Final Judgment.

34.     On or about November 12, 2020, Sheila and TIAA entered into a consent order wherein the February 26, 2020 final judgment was vacated and TIAA agreed to amend the complaint to add the estate of Patricia as a third-party Defendant on or before December 15, 2020. A copy of the consent order is attached as **Exhibit 7**.

35.     On January 29, 2021, TIAA renewed its Motion for Final Judgment ("Final Judgment Motion #2"). A copy of Final Judgment Motion #2 is attached as **Exhibit 8**. Through Final Judgment Motion #2, TIAA claimed the following fees and charges were owed as of January 15, 2021:

a. Late Charges: $756.06;
b. Winterizing/Securing: $3,760.00;

36.     Notably, through Final Judgment Motion #2, TIAA claimed that it charged an $80.00 biweekly Grass Cutting charge from approximately July 5, 2018[2] through December 3, 2020. *See Exhibit 8*. TIAA also charged "Lock Change" fees on three (3) different instances, totaling $140.00, from July 6, 2018 through October 5, 2018

37.     However, Sheila's neighbor, Mr. Raslowsky, had been maintaining the property at this juncture for Sheila for over seven (7) years, including all of the mowing and yard maintenance. In short, there had been no maintenance for Defendants to complete. It is unfathomable that Defendant could owe $160.00 for locks on a property that has no doors or lawn mowing on a vacant dirt lot. This is all further confirmed by the certification of Joseph Raslowsky. *See Exhibit 3*.

38.     On or about February 1, 2021, LoanCare acquired servicing of the Loan from TIAA Bank. A copy of the notice of servicing transfer is attached as **Exhibit 9**.

39.     On or before May 12, 2021, Sheila, through counsel, submitted a written request to LoanCare, through its counsel, for a payoff statement and for the total amount required to reinstate the Loan.

40.     Through correspondence dated May 12, 2021, LoanCare, through McCabe, responded to the payoff request and advised Sheila that the total amount required to pay off her loan as of May 24, 2021, was $515,506.81, broken down as follows:

---

[2] With the exception of July 6, 2018, when it charged $100.00, October 10, 2018, when it charged $160.00, and on September 12, 2019, when it charged an exorbitant $800.00.

| Description | Amount | |
|---|---|---|
| Principal Balance | $ | 366,840.03 |
| Accrued interest to May 12, 2021 | $ | 79,628.53 |
| *Forecasted* interest from date of this letter to the Good Through Date *(per diem $41.13)* | $ | 493.56 |
| Late charges | $ | 3,144.86 |
| Escrow Advance | $ | 51,082.61 |
| Incurred Attorney/Trustee Fees | $ | 5,215.00 |
| Incurred Attorney/Trustee Costs | $ | 3,837.32 |
| Property Preservation | $ | 3,772.40 |
| Property Inspection | $ | 675.00 |
| Title Costs | $ | 275.00 |
| Prior Legal Fees | $ | 892.50 |
| Less Suspense Balance | $ | (350.00) |

A copy of the Payoff Quote is attached as **Exhibit 10**.

41.    Through the Reinstatement Quote, LoanCare, through McCabe, advised Sheila that the total amount required to cure the default and bring the Loan current through May 21, 2021 was $174,353.03, broken down as follows:

| Description | Amount | |
|---|---|---|
| Mortgage Delinquency on Date of Letter | $ | 156,890.95 |
| Late Charges | $ | 3,144.86 |
| Property Inspection | $ | 675.00 |
| Property Preservation | $ | 3,772.40 |
| Title Costs | $ | 275.00 |
| Prior Legal Fees and Costs | $ | 892.50 |
| Incurred Attorney/Trustee Fees | $ | 5,215.00 |
| Incurred Attorney/Trustee Costs | $ | 3,837.32 |
| Less Suspense Balance | $ | -350.00 |

A copy of the Reinstatement Quote is attached as **Exhibit 11**.

42.     LoanCare sent Sheila correspondence dated January 14, 2022 and captioned "**NOTICE OF INTENTION TO FORECLOSE**" (the "NOI"). A copy of the NOI is attached as **Exhibit 12**.

43.     Through the NOI, LoanCare now advised Sheila that the total amount required to cure the default through and including the January 1, 2022 payment was $180,349.10, consisting of:

    a. $176,225.16 in Monthly Payments Due;
    b. $3,448.94 in Late Charges; and
    c. $675.00 in Other Charges.

44.     Notably, through Final Judgment Motion #2, the January 1, 2021 statement, the Payoff Quote, the Reinstatement Quote, and the NOI, TIAA and LoanCare each failed to give Sheila credit from the $132,182.01 of insurance proceeds.

## THE IMPROPER LATE FEES

45.     TIAA and LoanCare are mortgage "servicers" as that term is defined by 12 CFR § 1024.2(b) and 12 U.S.C. § 2605(i)(2). At all times relevant, TIAA, then LoanCare, was the servicer of Sheila's Loan.

46.     At all relevant times TIAA, then LoanCare, serviced Sheila's Loan on behalf of FNMA.

47.     As a mortgage loan servicer, TIAA, then LoanCare—on behalf of FNMA—regularly attempted to secure payments on Sheila's Loan.

48.     Pursuant to the terms of Sheila's Loan, she was required to make periodic, monthly installment payments on her Loan until the entire balance was paid in full. *See*, note for Sheila's Loan ("Sheila's Note" or "Plaintiff's Note"), ¶ 3, attached as Exhibit 1. Sheila's Loan specifically refers to these periodic installment payments as "monthly payments." *See,* Sheila's Note, ¶ 3

49.     Sheila's Loan further provides that if any "monthly payment" is not paid within a certain number of days after it is due, Sheila will be required to pay a "late charge." *See* Sheila's Note, ¶ 6(A).

50.     Pursuant to the terms of Sheila's Loan, if Sheila fails to timely make each required "monthly payment," she will be in default on their loans. *See* Sheila's Note, ¶ 6(B).

51.     Sheila's loan further provides that if she is in default, the "Note Holder"—*e.g.*, the current owner of the loan, or the servicer of the loan (on behalf of the current owner of the loan)—may send her written notice that if she does not pay the delinquent balance of her Loan by a certain date, the Note Holder may require her to immediately pay the full balance of her Loan—*i.e.*, Sheila's Loan would be "accelerated." *See* Sheila's Note, ¶ 6(C)

52.     Based on the plain terms of Sheila's Loan, Sheila was no longer required to make "monthly payments" on her loans after acceleration. Indeed, acceleration, by definition, requires a borrower to pay the *entire balance* of a loan *immediately*, instead of in preset installment amounts made at regularly scheduled and predetermined intervals. *Compare* Sheila's Note ¶ 6(B) (describing Sheila's payment obligations after acceleration) *with* Sheila's Note ¶ 3, respectively (describing Sheila's "monthly payment" obligations).

53.     As noted above, the terms of Sheila's loan documents establish that the condition precedent to the imposition of "late charges" is the failure to comply with her "monthly payment" obligations. *See* Sheila's Note, ¶ 6(A). However, after acceleration, that condition precedent can no longer occur because Sheila's obligation to make "monthly payments" ceases.  Therefore, Sheila's loan *does not* authorize the imposition of "late charges" after acceleration.

### TIAA's and LoanCare's Imposition of Late Charges

54. On or about October 1, 2015, Sheila's loan was in default due to her failure to timely remit periodic "monthly payments". *See* Sheila's Note, ¶ 6(B).

55. In compliance with the terms of Sheila's Loan, EverBank—acting on its own behalf, and on behalf of the assignees, investors, and/or owners of such loans—sent notices of default to Sheila stating that if Sheila did not pay all overdue amounts, they could require Sheila to immediately pay the full amount of unpaid principal and all the interest owed on such amount—*i.e.*, Sheila's Loan would be "accelerated." *See* Plaintiff's Note, ¶ 6.

56. After receiving these notices of default, Sheila did not remit further payments on her loan. As a result, EverBank—acting on its own behalf, and on behalf of the assignees, investors, and/or owners of such loans—accelerated Sheila's loan as was their right to do under the loan documents.

57. For the reasons set forth above, at the time Sheila's Loan was accelerated, her obligation to remit timely periodic "monthly payments" on her loan ceased, as she was instead required to *immediately* pay the *entire balance* of her loan. *See*, Sheila's Note, ¶ 6.

58. Since Sheila no longer had the obligation to remit timely periodic "monthly payments" on her loans, the contractual condition precedent relative to the imposition of "late charges"—*i.e.*, the failure to timely remit "monthly payments"—did not, and could not, occur.

59. Nevertheless, TIAA, then LoanCare—acting on its own behalf, and on behalf of FNMA—imposed "late charges" against Sheila post-acceleration (the "Improper Late Fees"). For the reasons stated above, these Improper Late Fees were not authorized by the terms of the loans or otherwise by law

60. Pursuant to the terms of Sheila's Loan, she was required to make periodic, "monthly payments" in the amount of $2,553.70 until the entire balance was paid in full. *See* Sheila's Note,

¶ 3.  Each of Sheila's "monthly payments" was due on the first day of each month beginning on February 1, 2009.  *See* Sheila's Note, ¶ 3

61.     Sheila's loan further provided that if any "monthly payment" was not paid within 15 days after it is due, she would be required to pay a "late charge" in the amount of 5% of the overdue "monthly payment" amount.  *See* Sheila's Note, ¶ 6(A).

62.     Pursuant to the terms of Sheila's loan, if she failed to timely make each required "monthly payment," she would be in default on her loan.  *See* Sheila's Note, ¶ 6(B).  Sheila's loan further provided that if she was in default, the Note Holder may send her written notice that if she did not pay the delinquent balance by a certain date, her loan would be accelerated.  *See* Sheila's Note, ¶ 6(B).

63.     The terms of Sheila's loan documents establish that the condition precedent to the imposition of "late charges" is the failure to comply with her "monthly payment" obligations. *See* Sheila's Note, ¶ 6(A). However, after acceleration, that condition precedent can no longer occur because Sheila's obligation to make "monthly payments" ceases.  Therefore, Sheila's loan *does not* authorize the imposition of "late charges" after acceleration.

64.     TIAA's predecessor alleged that Sheila failed to make her "monthly payments" on her loan in September 2015. As such, TIAA's predecessor alleged that Sheila was in default on her loan beginning on October 1, 2015.  *See* Sheila's Note, ¶ 6(B).

65.     Sheila did not make any further payments on her loan after receiving the Default Letter.  As a result, non-party Everbank accelerated Sheila's loan in or about August 2016.

66.     Based on the plain terms of Sheila's loan, she was no longer required or able to make "monthly payments" on her loan after it was accelerated absent reinstatement.  *Compare* Sheila's Note, ¶ 6(C) (describing Sheila's payment obligations after acceleration) *with* Sheila's

Note, ¶ 2 (describing Sheila's "monthly payment" obligations) and Sheila's Mortgage, ¶ 2 (same).  Consistent with this interpretation of Sheila's loan, Everbank's predecessor ceased engaging in collection activities relative to Sheila's "monthly payments" on her loan.

67.     As noted above, Sheila's loan only authorized the imposition of "late charges" in the event that Sheila failed to make a required "monthly payment."  *See* Sheila's Note, ¶ 6(A).  Because Sheila's obligation to make "monthly payments" on her loan ceased after it was accelerated, TIAA, and thereafter LoanCare, acting on behalf of FNMA—was no longer authorized to impose "late charges" against Sheila.

68.     As noted above, on or about September 23, 2016, Everbank filed the Foreclosure Action against Sheila. *See Exhibit 4*.

69.     Despite the Loan's acceleration, TIAA, then LoanCare, engaged in a practice of assessing late charges against Sheila. Specifically, TIAA, then LoanCare, assessed late charges of $76.02 on at least eight (8) instances from at least August 17, 2020 through December 16, 2021. *See* Sheila's mortgage statements attached as **Composite Exhibit 12**.

70.     On January 29, 2021, TIAA filed Final Judgment Motion #2. Final Judgment Motion #2, Defendants appended a Certification of Amount Due which enclosed a "Amount Due Schedule", through which Defendants provided a line-by-line breakdown of the total amount the Defendants allegedly owed as of January 15, 2021. *See* Exhibit 8.

71.     In Paragraph 5 of the Amount Due Certification, Defendants certified that "There are no just debts, set-offs, credits or allowances due or to become due from the plaintiff to defendant(s), other than those set forth herein." *See Exhibit 8.*

72.     Through the Foreclosure Amount Due Schedule, Defendants certified under oath that Sheila owed and will in the future owe $0.00 in late charges as of September 22, 2016. *See Exhibit 8*.

73.     Meanwhile, TIAA's December 17, 2020 and January 20, 2021 mortgage statement advised Sheila that it assessed late charges in the amount of $76.02 each on September 17, 2020 and on October 16, 2020 - late charges which were nowhere to be found in Final Judgment Motion #2. Accordingly, Defendants misrepresented in Final Judgment Motion #2 that no such late charges were assessed in an attempt to conceal the same from the Foreclosure Court and Sheila. *Compare* Exhibit 8 *with* Exhibit 13.

## IMPACT AND DAMAGE TO SHEILA

74.     The actions of Defendants in assessing illegal fees and costs, refusing to credit Sheila's insurance proceeds, and providing inconsistent amounts owed have caused Sheila great confusion as to ascertaining what should be a simple question - how much is owed on the Loan? Furthermore, Defendants' actions in assessing illegal fees and costs against Sheila directly harmed her as Defendants are requiring Sheila to repay these amounts to Defendants.

75.     Defendants further and proximately caused the following damages to Sheila:

   a.   $4,739.20, the amount of attorneys' fees and costs Defendants assessed over and above the amounts permitted under N.J. Court Rule 4:42-9(a)(4);

   b.   $132,182.01, the insurance proceeds that Defendants refuse to credit towards the Loan;

   c.   $4,480.00, the grass cutting, lock change, property preservation, and debris removal charges which Defendants had no basis to assess against the Loan; and

    d.  $2,388.80, the illegal post-acceleration late charges LoanCare seeks to collect against Sheila.

76.    Throughout this entire ordeal, Sheila has simply wanted to ascertain the proper amounts owed on the Loan and have LoanCare correct its errors as to the same.

**COUNT ONE: AGAINST ALL DEFENDANTS**
**VIOLATION OF N.J.S.A § 56:8-2, THE CONSUMER FRAUD ACT (CFA)**

77.    Sheila restates and incorporates all of her statements and allegations contained in paragraphs 1 through 76, in their entirety, as if fully rewritten herein.

78.    The CFA prohibits unlawful practices. Unlawful practices are defined as:

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate…

> N.J.S.A. § 56:8-2.

79.    In the operation of its business, Defendants have engaged in the use of unconscionable commercial practices, deception, and misrepresentations as described, supra.

80.    LoanCare is a "person" as defined by N.J.S.A. § 56:8-1(d) because LoanCare is a partnership, corporation, company, trust, business entity, or business association.

81.    TIAA is a "person" as defined by N.J.S.A. § 56:8-1(d) because TIAA is a partnership, corporation, company, trust, business entity, or business association.

82.    FNMA is a "person" as defined by N.J.S.A. § 56:8-1(d) because TIAA is a partnership, corporation, company, trust, business entity, or business association

83.    Defendants have engaged in deceptive, unconscionable, unfair, fraudulent and/or misleading commercial practices by charging Sheila foreclosure attorneys' fees in excess of what is permitted under Court Rules.

84.    New Jersey Court Rule 4:42-9(a)(4) permits a plaintiff in a foreclosure action to recover attorneys' fees. However, the amount recoverable is subject to a cap calculated through a multi-step percentage formula provided in Rule 4:42-9(a)(4).[3]

85.    Pursuant to R. 4:42-9(a)(4), the maximum amount of attorneys' fees that Defendants are permitted to charge, based on the May 12, 2021 payoff amount of $502,682.09[4], is $5,205.62. Yet, LoanCare now demands a total of $8,502.22 in attorney and legal fees and costs, approximately $3,296.60 in excess of the cap set forth under R. 4:42-9(a)(4). *See Exhibits 10, 11*.

86.    Defendants' actions in attempting to collect attorneys' fees in excess of what is permitted under Court Rules is an unlawful act under the CFA.

87.    Defendants' actions caused Sheila an ascertainable loss in the amount of $3,296.60, the amount of attorneys' fees Defendants are demanding she repay over and above the amount permitted under Court rules.

---

[3] *See* R. 4:42-9(a)(4):
   Actions in Which Fee Is Allowable. No fee for legal services shall be allowed in the taxed costs or otherwise, except…
   In an action for the foreclosure of a mortgage, the allowance shall be calculated as follows: on all sums adjudged to be paid the plaintiff amounting to $ 5,000 or less, at the rate of 3.5%, provided, however, that in any action a minimum fee of $ 75 shall be allowed; upon the excess over $ 5,000 and up to $ 10,000 at the rate of 1.5%; and upon the excess over $ 10,000 at the rate of 1%, provided that the allowance shall not exceed $ 7,500. If, however, application of the formula prescribed by this rule results in a sum in excess of $ 7,500, the court may award an additional fee not greater than the amount of such excess on application supported by affidavit of services. In no case shall the fee allowance exceed the limitations of this rule.
[4] This number is calculated by taking the full payoff of $515,506.81 and subtracting the $5,215.00 in "Incurred Attorney/Trustee Fees", the $3,837.32 in "Incurred Attorney/Trustee Costs", and the $892.50 in "Prior Legal Fees".

88.     Defendants violated the CFA by engaging the pattern and practice of deceiving, misleading, misrepresenting, and/or knowingly concealing material facts regarding the Improper Late Fees.

89.     Each unconscionable practice, false promise, misrepresentation by Defendants described, *infra*, constitutes a separate violation under the NJCFA.

90.     On January 29, 2021, Defendant filed the Final Judgment Motion #2. Through Final Judgment Motion #2, Defendant appended a Certification of Amount Due which enclosed a "Amount Due Schedule", through which Defendants provided a line-by-line breakdown of the total amount that Sheila allegedly owed as of January 15, 2021. *See Exhibit 8*.

91.     In Paragraph 5 of the Amount Due Certification Defendant certified that "There are no just debts, set-offs, credits or allowances due or to become due from the plaintiff to defendant(s), other than those set forth herein." *See* Exhibit 8.

92.     Through the Mortgage Foreclosure Amount Due Schedule, Defendants certified under oath that Sheila owed and will in the future owe $0.00 in late charges as of September 22, 2016. *See Exhibit 8*.

93.     Meanwhile, on December 17, 2020, TIAA issued Sheila a mortgage statement which advised her that she was assessed a total of $152.04 in late charges between September 16, 2020 and October 16, 2020 - $152.042 in late charges which were nowhere to be found in the Final Judgment Motion #2. Accordingly, Defendants misrepresented in Final Judgment Motion #2 that no such late charges were assessed in an attempt to conceal the same from the Foreclosure Court and Sheila. *Compare* Exhibit 8 *with* Exhibit 13.

94.     Defendants' charging of post acceleration late fees contrary to the contract and after having certified to the court that no late charges were due or would become due to the court is an unconscionable commercial practice and or other affirmative act in violation of the CFA.

95.     Sheila suffered an ascertainable loss in the amount of $2,388.80, the amount she was charged for post-acceleration late fees.

96.     Defendants engaged in deceptive, unconscionable, unfair, fraudulent and/or misleading commercial practices by charging Sheila Lock Change fees after the property was demolished and grass cutting fees when Sheila's neighbor maintained the lawn.

97.     Sheila suffered an ascertainable loss in the amount of $3,220, consisting of the amount she was charged grass cutting ($3,060.00) and Lock Changes ($160.00).

## COUNT TWO: AGAINST LOANCARE
### Violation of the FDCPA, 15 U.S.C. §§ 1692e and 1692f

98.     Sheila restates and incorporates all of her statements and allegations contained in paragraphs 1 through 76, in their entirety, as if fully rewritten herein.

99.     The FDCPA makes it an illegal, "unfair practice" for a debt collector to undertake "the collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law." 15 U.S.C. § 1692f(1).

100.     "Unquestionably, the scope of the FDCPA is broad" so it would be anomalous to conclude that "any amount" fails to encompass the Improper Late Fees. *See*, *Allen v. LaSalle Bank*, 629 F.3d 364, 368 (3d Cir. 2011).

101.     Sheila has a private right of action under the FDCPA pursuant to 15 U.S.C. § 1692k(a) for the claimed breaches and such action provides for remedies including actual damages, statutory damages, and attorneys' fees and costs.

102.    Sheila obtained the mortgage loans for household purposes, namely the purchases of the home that she occupied as her primary residence.

103.    LoanCare does business nationwide as a business entity operating as a collection agency, and is a "debt collector" as the term is defined by 15 U.S.C. § 1692a(6).

104.    Sheila's loan reflected a contractual default when LoanCare acquired servicing of the loans.

105.    LoanCare assessed Late Fees in the amount of $76.02 against Sheila's Loan on April 16, 2021, May 17, 2021, June 16, 2021, July 16, 2021, and on December 16, 2021.

106.    The post acceleration Late Fees that LoanCare has imposed against and collected or attempted to collect from Sheila are not authorized by the terms of her loan or otherwise by law.

107.    As the post acceleration Late Fees imposed by LoanCare to Sheila is not authorized by the contract or any provision of law, their collection violates 15 U.S.C. § 1692f.

108.    The excessive Attorneys' Fees that LoanCare has imposed against and collected or attempted to collect from Sheila through the Payoff Quote and Reinstatement Quote is not authorized by the terms of her loan or otherwise by R. 4:42-9(a)(4).

109.    As the excessive Attorneys' Fees imposed by LoanCare to Sheila are not authorized by the contract or any provision of law, their collection violates 15 U.S.C. § 1692f.

110.    The FDCPA makes it illegal for a debt collector to misrepresent "the character, amount, or legal status of any debt." 15 U.S.C. § 1692e(2).

111.    The FDCPA makes it illegal for a debt collector to misrepresent "the character, amount, or legal status of any debt." 15 U.S.C. § 1692e(2).

112. By demanding the Improper Late Fees through periodic billing statements, payoff statement, and reinstatement quotes from Sheila, LoanCare has misrepresented the amounts due and owing in relation to Sheila's Loan in violation of 15 U.S.C. § 1692e(2).

113. The excessive Attorneys' Fees that LoanCare has imposed against and collected or attempted to collect from Sheila is not authorized by the terms of her loan or otherwise by R. 4:42-9(a)(4).

114. As the excessive Attorneys' Fees imposed by LoanCare to Sheila are not authorized by the contract or any provision of law, their collection violates 15 U.S.C. § 1692f.

115. As a result of Rushmore's actions, Rushmore is liable to Plaintiff and FDCPA Subclass members for actual damages, statutory damages, costs, and attorneys' fees. 15 U.S.C. § 1692k.

## COUNT THREE: AGAINST FNMA

### (Violations of 15 U.S.C. § 1639g and 12 C.F.R. § 1026.36(c)(3))

116. Sheila restates and incorporates all of her statements and allegations contained in paragraphs 1 through 76, in their entirety, as if fully rewritten herein.

117. The Loan is a closed-end consumer credit transaction secured by her respective dwelling as contemplated by TILA and Regulation Z. 15 U.S.C. § 1602; 15 U.S.C. § 1639g; 12 C.F.R. § 1026.36(b).

118. As such, FNMA is subject to the requirements of TILA and Regulation Z in relation to the Loan.

119. Sheila submitted a written request to FNMA and/or LoanCare seeking an accurate payoff balance for her loan pursuant to 15 U.S.C. § 1639g and 12 C.F.R. § 1026.36(c)(3).

120.     Specifically, TILA provides that a creditor or servicer of a home loan shall provide an _accurate_ payoff balance within a reasonable period, but within seven (7) business days regardless of circumstances, upon receipt of a written request from a borrower for the same. 15 U.S.C. § 1639g.

121.     This provision of TILA is enforced against creditors and servicers in Regulation Z (and, as noted above, is incorporated into the requirements of Regulation X and RESPA). Specifically, regarding payoff statements, Regulation Z provides that:

> In connection with a consumer credit transaction secured by a consumer's dwelling, a creditor, assignee or servicer, as applicable, must provide an **accurate** statement of the total outstanding balance that would be required to pay the consumer's obligation in full as of a specified date. The statement shall be sent within a reasonable time, but in no case more than seven business days, after receiving a written request from the consumer or any person acting on behalf of the consumer. When a creditor, assignee, or servicer, as applicable, is not able to provide the statement within seven business days of such a request because a loan is in bankruptcy or foreclosure, because the loan is a reverse mortgage or shared appreciation mortgage, or because of natural disasters or other similar circumstances, the payoff statement must be provided within a reasonable time.

> 12 C.F.R. § 1026.36(c)(3). (Emphasis added).

122.     In response to the Payoff Request, FNMA, or LoanCare, acting on behalf of FNMA—provided Sheila with a payoff statement (the "Payoff Statement") that included the Excessive Attorneys' Fees, the Improper Late Fees, the Improper Grass Cutting Fees, and the improper lock change fees as an amount due and owing on the Loan. Since the payoff balance reflected on this Payoff Statement included these improper charges, the Payoff Statement was inaccurate because it overstated the payoff balance of the Loan.

123. As a result of the foregoing conduct, FNMA—or LoanCare, acting on behalf of FNMA—violated the duties owed to Sheila pursuant to 15 U.S.C. § 1639g and 12 C.F.R. § 1026.36(c)(3).

124. LoanCare was acting on behalf of FNMA when they (1) imposed the Improper Attorneys Fees, the Improper Late Fees, the Improper Grass Cutting Fees, and the Improper Lock Change Fees against Sheila; (2) received, evaluated, and responded to the Payoff Request; and (3) provided Sheila with an inaccurate Payoff Statement. Therefore, FNMA is vicariously liable for violations of 15 U.S.C. § 1639g and 12 C.F.R. § 1026.36(c)(3) committed by its servicers as alleged in this matter. *Kolano*, 2014 WL 1117862 at *6 (citing, *inter alia*, *Kissinger*, 888 F.Supp.2d at 1315); *Justice*, 2015 WL 235738 at *13, n. 9.

125. FNMA's violations of 15 U.S.C. § 1639g and 12 C.F.R. § 1026.36(c)(3) harmed Sheila in several ways, as specified below:

    a. First, "a core object of" TILA's disclosure requirements is the protection of "a consumer's concrete interest in avoiding the uninformed use of credit," such that the inaccurate Payoff Statements harmed the Hickses' "concrete interest in the informed use of credit." *Strubel v. Comenity Bank*, 842 F.3d 181, 190 (2nd Cir. 2016). Indeed, the inaccurate Payoff Statement jeopardized Sheila's ability to accurately assess and pursue a loan modification to avoid foreclosure.

    b. Second, as a result of the inaccurate Payoff Statement, Sheila reasonably believed that she was required to pay the Improper Attorneys' Fees, the Improper Late Fees, the Improper Grass Cutting Fees, and the Improper Lock Change Fees and, as a result, will be forced to pay those improper fees

and charges (either directly or indirectly) as part of reinstating or refinancing her loan, through a loan modification, or as a result of selling her Home.

    c.    Third, Sheila was harmed because she incurred the expenses associated with sending the Payoff Request—such as their time, postage, attorneys' fees, etc.—but they did not receive accurate information to which they were legally entitled pursuant to TILA and Regulation Z. Because FNMA—or LoanCare, acting on behalf of FNMA —failed to meet its obligations under TILA and Regulation Z, the time and expense associated with the Hickses' submission of the Payoff Requests "metamorphosed into damages." *E.g.*, *Marais v. Chase Home Fin., LLC*, 24 F.Supp.3d 712, 728 (S.D. Ohio 2014); *Justice*, 2015 WL 235738, at *19; *McMillen v. Resurgent Capital Services, L.P.*, 2015 WL 5308236, at *10 (S.D. Ohio 2015); *Dale v. Selene Fin. LP*, 2016 WL 6024580, at *3 (N.D. Ohio 2016).

126.    For the reasons stated above, Sheila was harmed as a result of the actions of FNMA—or LoanCare, acting on behalf of FNMA.

127.    FNMA is vicariously liable for violations of 15 U.S.C. § 1639g and 12 C.F.R. § 1026.36(c)(3) committed by its servicers as alleged in this matter. *E.g.*, *Kolano*, 2014 WL 1117862 at *6.

128.    As a result of the actions of FNMA and LoanCare—acting on behalf of FNMA— FNMA is liable to Sheila for actual damages, statutory damages, and attorneys' fees and costs. 15 U.S.C. §§ 1640(a)(1)-(3); 15 U.S.C. § 1641.

## **COUNT FOUR: AGAINST FNMA**

### **(Violations of 15 U.S.C. § 1639g and 12 C.F.R. § 1026.36(d)(3)(ii))**

129.    Sheila restates and incorporates all of her statements and allegations contained in paragraphs 1 through 76, in their entirety, as if fully rewritten herein.

130.    The Loan is a closed-end consumer credit transaction secured by her respective dwelling as contemplated by TILA and Regulation Z. 15 U.S.C. § 1602; 15 U.S.C. § 1639g; 12 C.F.R. § 1026.36(b).

131.    As such, FNMA is subject to the requirements of TILA and Regulation Z in relation to the loans.

132.    12 C.F.R. § 1026.36(d)(3)(ii) provides:

> **Content and layout of the periodic statement.** The periodic statement required by this section shall include...The following items, grouped together in close proximity to each other and located on the first page of the statement...The total of all payments received since the beginning of the current calendar year, including a breakdown of that total showing the amount, if any, that was applied to principal, interest, escrow, fees and charges*, and the amount, if any, currently held in any suspense or unapplied funds account*.

> (Emphasis added).

133.    As described, *supra*, LoanCare continuously sent  Sheila billing statements which fail to disclose the $132,182.01 it is holding on Sheila's behalf.

134.    As the $132,182.01 is "an amount…currently held in **any** suspense or unapplied funds account" (emphasis added), FNMA, through LoanCare, is obligated to disclose this figure in its billing statements.

135.    As a result of the foregoing conduct, FNMA—or LoanCare, acting on behalf of FNMA—violated the duties owed to Sheila pursuant to 15 U.S.C. § 1639g and 12 C.F.R. § 1026.36(d)(3)(ii). During this period, LoanCare, on behalf of FNMA, has consistently issued mortgage statements which failed to disclose the $132,182.01 in insurance proceeds.

136.    LoanCare was acting on behalf of FNMA when they issued the inaccurate mortgage statements to Sheila. Therefore, FNMA is vicariously liable for violations of 15 U.S.C. § 1639g and 12 C.F.R. § 1026.36(d)(3)(ii) committed by its servicers as alleged in this matter. *Kolano*, 2014 WL 1117862 at \*6 (citing, *inter alia*, *Kissinger*, 888 F.Supp.2d at 1315); *Justice*, 2015 WL 235738 at \*13, n. 9.

137.    FNMA's violations of 15 U.S.C. § 1639g and 12 C.F.R. § 1026.36(d)(3)(ii) harmed the Hickses in several ways, as specified below, and *supra*:

> a.    First, "a core object of" TILA's disclosure requirements is the protection of "a consumer's concrete interest in avoiding the uninformed use of credit," such that the inaccurate Payoff Statement harmed Sheila's "concrete interest in the informed use of credit." *Strubel*, 842 F.3d at 190. Indeed, the inaccurate Mortgage Statements jeopardized Sheila's ability to accurately assess and pursue a loan modification to avoid foreclosure and to otherwise assess the amounts due on the Loan.

138.    FNMA is vicariously liable for violations of 15 U.S.C. § 1639g and 12 C.F.R. § 1026.36(c)(3) committed by its servicers as alleged in this matter. *E.g.*, *Kolano*, 2014 WL 1117862 at \*6.

139.    As a result of the actions of FNMA and LoanCare—acting on behalf of FNMA—FNMA is liable to Sheila for actual damages, statutory damages, and attorneys' fees and costs. 15 U.S.C. §§ 1640(a)(1)-(3); 15 U.S.C. § 1641

## PRAYER FOR RELIEF

**WHEREFORE** Plaintiff Estate of Patricia Blumenstock respectfully requests that this Court enter an order granting judgment in her favor and against Defendant LoanCare, LLC:

A. For treble actual damages and reasonable attorneys' fees and costs as to the allegations contained in Count One;

B. For statutory damages of up to One Thousand Dollars ($1,000.00) for each and every separate violation of the FDCPA as contained in Count Two;

C. For an award of actual damages and reasonable attorneys' fees and costs as to the allegations contained in Count Two; and

D. Such other relief this Court may deem just and proper.

**WHEREFORE** Plaintiff Estate of Patricia Blumenstock respectfully requests that this Court enter an order granting judgment in her favor and against Defendant TIAA Bank for the following:

A. For treble actual damages and reasonable attorneys' fees and costs as to the allegations contained in Count One;

B. Such other relief this Court may deem just and proper.

**WHEREFORE** Plaintiff Estate of Patricia Blumenstock respectfully requests that this Court enter an order granting judgment in her favor and against Defendant Federal National Mortgage Association for the following:

A. For treble actual damages and reasonable attorneys' fees and costs as to the allegations contained in Count One;

B. For an award of actual damages, costs, and attorneys' fees as to Counts Three and Four;

C.      For statutory damages of no less than Four Hundred Dollars ($400.00) and up to Four Thousand Dollars ($4,000.00) for each the violations of TILA as contained in Counts Three and Four; and,

D.      Such other relief this Court may deem just and proper.

Respectfully submitted,

*/s/ Javier L. Merino*
Javier L. Merino #078112014
**THE DANN LAW FIRM, PC**
1520 U.S. Highway 130 (Ste 101)
North Brunswick, NJ 08902
Telephone: (216) 373-0539
Facsimile: (216) 373-0536
notices@dannlaw.com

*Counsel for Plaintiff Estate of Patricia Blumenstock*

27

## JURY DEMAND

Plaintiff Estate of Patricia Blumenstock hereby respectfully demands a trial by jury on all such claims that may be so tried.

*/s/ Javier L. Merino*
Javier L. Merino #078112014
**THE DANN LAW FIRM, PC**